IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84017-7-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| WILSON, MICHAEL LYNN, | |
| Appellant. | |

BOWMAN, J. — Michael Lynn Wilson appeals his convictions for several counts of domestic violence (DV) rape of a child and child molestation. He argues the trial court violated his right to a fair and impartial jury by allowing biased jurors to serve on his panel, conducted an inadequate investigation into the potential juror bias, and erroneously denied his motion for a mistrial. He also argues that one of his community custody conditions is unconstitutionally vague. In a statement of additional grounds for review (SAG), Wilson contends that he received ineffective assistance of appellate counsel. We affirm.

## FACTS

Wilson is A.W.'s father. When A.W. was 14 years old, her mother discovered concerning messages on A.W.'s social media accounts suggesting she was raped by another teenager. When A.W.'s mother asked her about the messages, A.W. admitted that Wilson was the person who raped her.

A.W.'s mother contacted the police. During a child forensic interview, A.W. disclosed that Wilson began touching her when she was about 7 years old

and described several sexual assaults.  The State charged Wilson with two counts of first degree rape of a child, one count of second degree rape of a child, one count of third degree rape of a child, and one count of first degree child molestation, all with DV designations.

The case proceeded to a five-day jury trial.  On day four, juror 3 and Wilson sat near each other at a restaurant during a lunch break and briefly spoke.  Juror 3 then returned to the jury room and told several other jurors about the interaction.  They all agreed juror 3 should disclose the encounter to the jury coordinator and changed the subject.  When the jury coordinator told the court about the situation, it immediately separated juror 3 from the rest of the jury and informed the parties.

The court then questioned juror 3 about his interaction with Wilson outside the presence of the other jurors.  Juror 3 told the court that he and Wilson had an "exchange of pleasantries" at lunch.  He explained that he was sitting at a restaurant window seat when Wilson came in, sat near him, and commented on the music, food, and beer.  That was the extent of their conversation.  Juror 3 said that he did not have his juror badge displayed and that he did not immediately recognize Wilson.  The court asked juror 3 whether he shared his exchange with the other jurors.  He said he told about five other jurors in the jury room when he returned from lunch.  Juror 3 explained that he told those other jurors that a "total strange thing" happened—that he "had lunch . . . sitting across from the defendant" and that it was "a totally weird situation."

The court sent juror 3 back to the separate room and asked counsel how they would like to proceed. The attorneys had more questions. On further questioning, juror 3 told the court that he neither shared the substance of the conversation with the other jurors nor shared any of his impressions about that conversation. Instead, juror 3 said the other jurors joked about him and Wilson having "shared a lovely meal together, or something," and then moved to other topics of conversation.

The court again excused juror 3 to the separate room to confer with the attorneys. When juror 3 returned, the court clarified that juror 3 was seated and eating in the restaurant when Wilson sat down and started talking to him. The court then asked juror 3 to describe the other jurors he spoke to about the interaction.

The court again excused juror 3 to the separate room. It then identified juror 7 as one of the other jurors present when juror 3 returned from lunch and brought her into the courtroom "to determine what, if anything, was said." Juror 7 explained that juror 3 returned from lunch and told the other jurors that he was eating lunch at a nearby barbeque restaurant when Wilson came in. According to juror 7, juror 3 mentioned that he and Wilson spoke, but juror 3 did not describe the substance of their conversation. After that, juror 3 asked the other jurors in the room whether that interaction was something he needed to disclose to the court, and they responded "yes." After questioning juror 7, the court found that her and juror 3's descriptions of the encounter were consistent and decided not to question any other jurors.

3

Based on juror 3's responses, the court decided to excuse him from the panel. But after questioning juror 7, the court found that it did not appear the other jurors were prejudiced. Wilson moved for a mistrial, which the trial court denied. It found that "Wilson created this situation" because he "approached this juror." The court concluded, "The remedy at this point is to remove the juror who has had this conversation with Mr. Wilson."

The jury convicted Wilson on all but one count of DV first degree rape of a child. The court sentenced Wilson to a concurrent, standard range, indeterminate sentence of 280 months to life followed by a lifetime of community custody. One of Wilson's community custody conditions precludes him from dating women or forming relationships "with families who have minor children, as directed by the supervising Community Corrections Officer [(CCO)]."

Wilson appeals.

ANALYSIS

Wilson argues the trial court violated his right to a fair and impartial jury, conducted an inadequate investigation into potential juror bias, and erroneously denied his motion for a mistrial. He also argues that one of his community custody conditions is unconstitutionally vague. In a SAG, Wilson contends that he received ineffective assistance of appellate counsel.[1]

---

[1] Wilson also appealed the trial court's imposition of the victim penalty assessment (VPA). On January 29, 2024, we granted Wilson's motion to supplement the record with the trial court's order granting his motion to waive the VPA. That issue is now moot, so we do not address it.

4

1. <u>Constitutional Right to a Fair Jury</u>

Wilson argues that the trial court deprived him of his right to a fair trial by leaving biased jurors on his jury. We disagree.

The federal and state constitutions guarantee an accused person the right to due process and to a trial before a fair and impartial jury. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, §§ 21, 22. "This right exists throughout the entire trial process and is safeguarded in part by statutes and rules that require the trial judge to dismiss biased jurors." *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 807, 425 P.3d 807 (2018). The trial court must dismiss jurors for actual or implied bias. *See Kuhn v. Schnall*, 155 Wn. App. 560, 574, 228 P.3d 828 (2010). We review a trial court's decision to discharge a juror for abuse of discretion. *State v. DePaz*, 165 Wn.2d 842, 858, 204 P.3d 217 (2009). A court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Id.*

"Actual bias" is

the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.

RCW 4.44.170(2).[2] The party challenging the juror for actual bias generally must prove that (1) the juror "has formed or expressed" a biased opinion and that (2) "from all the circumstances, . . . the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190. "Implied bias" requires showing the

---

[2] RCW 4.44.170 applies to potential jurors. But our Supreme Court adopted this definition of "actual bias" for empaneled jurors as well. *Sassen Van Elsloo*, 191 Wn.2d at 807-08.

existence of facts that "in judgment of law disqualifies the juror."[3]  RCW

4.44.170(1); *Kuhn*, 155 Wn. App. at 574.

Citing *Willie v. Maggio*, 737 F.2d 1372 (5th Cir. 1984), Wilson argues that

several jurors on his panel were biased after their interaction with juror 3.  In

*Willie*, the Fifth Circuit held that "[a] juror is presumed to be biased when he or

she is apprised of such inherently prejudicial facts about the defendant that the

court deems it highly unlikely that the juror can exercise independent judgment."

737 F.2d at 1379.  As an example, the *Willie* court pointed to *Leonard v. United*

*States*, 378 U.S. 544, 84 S. Ct. 1696, 12 L. Ed. 2d 1028 (1964).  *Id.*

In *Leonard*, two juries convicted the defendant in two separate trials of

forging endorsements on government checks and of transporting a forged

instrument in interstate commerce.  378 U.S. at 544.  The jury in the first case

"announced its guilty verdict in open court in the presence of the jury panel from

which the jurors who were to try the second case . . . were selected."  *Id.*  The

jury in the second case then found the defendant guilty.  *Id.*  The Supreme Court

---

[3] RCW 4.44.180 lists the four bases that support a finding of implied bias:

(1) Consanguinity or affinity within the fourth degree to either party.

(2) Standing in the relation of guardian and ward, attorney and client, master and servant or landlord and tenant, to a party; or being a member of the family of, or a partner in business with, or in the employment for wages, of a party, or being surety or bail in the action called for trial, or otherwise, for a party.

(3) Having served as a juror on a previous trial in the same action, or in another action between the same parties for the same cause of action, or in a criminal action by the state against either party, upon substantially the same facts or transaction.

(4) Interest on the part of the juror in the event of the action, or the principal question involved therein, excepting always, the interest of the juror as a member or citizen of the county or municipal corporation.

concluded that the jurors in the second case were biased and reversed. *Id.* at 545.

But a court "will not readily presume that a juror is biased solely on the basis that he or she has been exposed to prejudicial information about the defendant outside the courtroom." *Willie*, 737 F.2d at 1379. In *Willie*, four jurors heard the prosecutor in a codefendant's trial explain that in Louisiana, all persons involved in the commission of a crime, "whether or not they directly committed the act constituting the offense, are held liable as principals." *Id.* at 1377. They also heard the codefendant's attorney explain his theory of defense that turned out to be antagonistic to the defense Willie advanced. *Id.* at 1380. Even so, the Fifth Circuit concluded that because the jurors did not hear any facts or evidence from the other trial, the information the four jurors heard was not inherently prejudicial such that it could infer bias. *Id.* at 1380-81.

Wilson argues that juror 3's disclosure of their interaction at lunch apprised several jurors of facts so inherently prejudicial that they likely "could [not] exercise independent judgment." According to Wilson, those jurors likely believed that he "had wrongfully spoken to—or worse, tampered with—a member of the jury." But the record does not support that characterization.

Juror 3 did not inform the other jurors of any fact about Wilson, only that they had spoken. He did not relay who initiated the conversation, the substance of the conversation, or any of his impressions about the conversation. Juror 7 confirmed juror 3's description of the event. Wilson fails to show that the jurors

7

learned any fact about him so inherently prejudicial that they could not exercise independent judgment in deciding his case.

The trial court did not abuse its discretion by leaving the other jurors on Wilson's jury panel.

2. Trial Court's Investigation

Wilson argues that the court did not sufficiently investigate the irregularity with juror 3 because it "did not inquire whether the remaining jurors harbored any bias or prejudice against [him]." We disagree.

We review a trial court's investigation of jury irregularities for an abuse of discretion. *State v. Elmore*, 155 Wn.2d 758, 773-74, 123 P.3d 72 (2005). A discretionary decision is based on untenable grounds or made for untenable reasons if it rests on facts unsupported in the record. *DePaz*, 165 Wn.2d at 858.

RCW 2.36.110 and CrR 6.5 govern discharge and excusal of an empaneled juror. *Sassen Van Elsloo*, 191 Wn.2d at 807. RCW 2.36.110 imposes on the judge a duty to excuse any empaneled juror who, in the opinion of the judge, has shown unfitness to continue on the jury "by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." *Id.* at 809. And CrR 6.5 requires the court to discharge any empaneled juror who it finds unable to perform their duties and to appoint an alternate juror. *Id.* "Together, the statute and the rule 'place a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform [their] duties.' " *Id.* (quoting *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000)).

8

But a trial court "has significant discretion to determine what investigation is necessary on a claim of juror misconduct." *Turner v. Stime*, 153 Wn. App. 581, 587, 222 P.3d 1243 (2009); *Elmore*, 155 Wn.2d at 773. That discretion includes determining the scope and manner of investigation most appropriate in a particular case. *Elmore*, 155 Wn.2d at 773-75. There is no "mandatory format." *Jorden*, 103 Wn. App. at 229. That is because we recognize that the trial court is " 'uniquely situated' " to make credibility determinations that arise in investigating juror issues. *Elmore*, 155 Wn.2d at 778 (quoting *United States v. Abbell*, 271 F.3d 1286, 1303 (11th Cir. 2001)).

Here, the court immediately separated juror 3 from the other jurors and asked the parties how they would like to proceed. The court then questioned juror 3 about his interaction with Wilson outside the presence of the other jurors. After initial questioning and argument by counsel, the court brought juror 3 back into the courtroom to determine the scope and substance of what he told the other jurors. Throughout the questioning by the court and the attorneys, juror 3 repeatedly said he told the other jurors that he spoke with Wilson but did not disclose the substance of what they talked about or his impressions about the interaction. The court then brought juror 7 into the courtroom for questioning outside the presence of the other jurors. The court asked juror 7 broad, open-ended questions such as whether "there [was] anything that occurred over the lunch hour that you need to report to the Court." Juror 7 confirmed juror 3's recitation of the incident. The court determined that because juror 7's information

9

was "absolutely consistent" with what juror 3 said, it saw no need to poll more jurors.

The court's investigation sufficiently determined that juror 3 did not relay any prejudicial information to the other jurors. The procedure did not amount to an abuse of discretion.

3. Motion for Mistrial

Wilson argues that the trial court erred by denying his motion for a mistrial. Again, we disagree.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *State v. Jungers*, 125 Wn. App. 895, 902, 106 P.3d 827 (2005). A trial court has broad discretion to rule on irregularities during a trial. *State v. Wade*, 186 Wn. App. 749, 773, 346 P.3d 838 (2015). The trial court is in the best position to determine whether a trial irregularity caused prejudice. *Id.*

The court should grant a mistrial " 'only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly.' " *Wade*, 186 Wn. App. at 773 (quoting *State v. Mak*, 105 Wn.2d 692, 701, 718 P.2d 407 (1986), *abrogated on other grounds by State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994)). Ultimately, we will reverse the trial court only if there is a substantial likelihood the trial irregularity affected the jury's verdict. *Id.* In determining whether a trial court abused its discretion by denying a motion for a mistrial, we examine (1) the seriousness of the irregularity, (2) whether the statement was cumulative of other properly admitted evidence, and (3) whether the court could have cured the irregularity with an instruction. *Id.*

An irregularity is serious when it could "materially affect the outcome of the trial." *See State v. Hopson*, 113 Wn.2d 273, 286, 778 P.2d 1014 (1989). Courts have found irregularities to be serious where, for example, a party intentionally violates a pretrial order or where the jury hears inherently prejudicial inadmissible testimony. *See State v. Gamble*, 168 Wn.2d 161, 178, 225 P.3d 973 (2010); *State v. Escalona*, 49 Wn. App. 251, 255-56, 742 P.2d 190 (1987).

Here, the irregularity involved information jurors heard outside the confines of the trial. As explained above, the information did not prejudice Wilson. In any event, the trial court instructed the jury that it must decide the case solely on the evidence presented in the courtroom. We presume the jury follows the court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428-29, 220 P.3d 1273 (2009).[4]

The trial court did not err by denying Wilson's motion for a mistrial.[5]

## 4. Community Custody Condition

Wilson argues that his community custody condition that he not "form relationships with families who have minor children, as directed by the supervising [CCO]," is unconstitutionally vague.[6] We disagree.

---

[4] Wilson argues that the release of juror 3 without further explanation suggested to the jury that Wilson disobeyed the trial court's instructions. But Wilson offers no compelling explanation as to why that is so. Particularly when juror 3 did not tell the jurors that Wilson initiated the contact.

[5] The State argues that we should affirm the trial court because Wilson created his own grounds for a mistrial by approaching juror 3 first. Because we conclude Wilson suffered no prejudice from the irregularity, we need not reach that issue.

[6] The State at first conceded this issue. After the State's concession, our Supreme Court decided *In re Personal Restraint of Ansell*, 1 Wn.3d 882, 533 P.3d 875 (2023). Following oral argument, the State filed a statement of additional authorities, identifying *Ansell* and urging us to reject Wilson's argument. Wilson did not respond.

We generally review a court's imposition of crime-related prohibitions for an abuse of discretion. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). But we review de novo whether the court had any authority to impose the condition. *In re Pers. Restraint of Ansell*, 1 Wn.3d 882, 892, 533 P.3d 875 (2023); *Armendariz*, 160 Wn.2d at 110. Due process under both the state and federal constitutions requires that citizens have fair warning of proscribed conduct. *Ansell*, 1 Wn.3d at 893.

> "A legal prohibition, such as a community custody condition, is unconstitutionally vague if (1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement."

*Id.* (quoting *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018)).

When deciding a vagueness challenge, we consider the terms in the context in which they are used. *Ansell*, 1 Wn.3d at 893. We read community custody conditions " 'in a commonsense fashion in the context of the judgment and sentence, and related documents that will be available to [the CCO].' " *Id.* at 898[7] (quoting *State v. Johnson*, 197 Wn.2d 740, 748, 487 P.3d 893 (2021)). Under the vagueness doctrine, community custody conditions need not be drafted with such precision that a person is able to " 'predict with complete certainty the exact point at which [their] actions would be classified as prohibited conduct.' " *Id.* at 893[8] (quoting *Padilla*, 190 Wn.2d at 677). Instead, " '[i]f persons of ordinary intelligence can understand what the [condition] proscribes,

---

[7] Alteration in original.

[8] Alteration in original, internal quotation marks omitted.

notwithstanding some possible areas of disagreement, the [condition] is sufficiently definite.' " *Id.*[9] (quoting *City of Spokane v. Douglass*, 115 Wn.2d 171, 179, 795 P.2d 693 (1990)).

Our Supreme Court recently considered a vagueness challenge to a similar community custody term in *Ansell*. In that case, the defendant and his wife were part of a babysitting group with two other families in their neighborhood. *Ansell*, 1 Wn.3d at 887. Ansell molested the children he babysat. *Id.* at 887-88. He pleaded guilty to three counts of child molestation and the court sentenced him to an indeterminate sentence. *Id.* at 888. After serving the minimum term of incarceration, the Indeterminate Sentence Review Board found him eligible for community custody. *Id.* One of Ansell's community custody conditions provided, " 'You must not form relationships with persons/families with minor children without first disclosing your sex offender status and having this relationship approved by your CCO.' " *Id.* at 889.

In a personal restraint petition, Ansell challenged the constitutionality of that condition. *Ansell*, 1 Wn.3d at 888-89. We found the condition unconstitutionally vague. *Id.* But our Supreme Court reversed. *Id.* at 892. Recognizing that community custody terms " 'are not considered in a "vacuum," ' " the court noted that Ansell's judgment and sentence showed that he received three child molestation convictions, that the substance of the board's release decision showed he offended against "the children of friends and neighbors," and that his other community custody conditions prevented him from

---

[9] Alterations in original.

13

dating people who have children and from contacting minors without a chaperone. *Id.* at 898[10] (quoting *State v. Bahl*, 164 Wn.2d 739, 754, 193 P.3d 678 (2008)). Read in context, the information showed that "the condition relates to preventing Ansell from accessing children based on his relationship with their parents, as he did with the children he molested." *Id.* So, the condition provides sufficient standards to prevent arbitrary enforcement. *Id.*

The *Ansell* court also concluded that in context, "an ordinary person could understand that [the] condition . . . is aimed at preventing easy access to children, which is a possibility in any relationship," and "prohibits Ansell from accessing children through friendly relationships, business relationships, neighborly relationships, and the like." 1 Wn.3d at 899. It concluded that though broad, the condition is not unconstitutionally vague. *Id.*

Wilson's community custody condition prohibits him from forming relationships "with families who have minor children as directed by the supervising [CCO]." As in *Ansell*, read in the context of his offense and other community custody conditions, this condition is not unconstitutionally vague. The jury convicted Wilson of several sex crimes against his daughter. A.W. testified that Wilson would assault her even when her siblings and mother were present in the home. And Wilson is subject to other terms of community custody aimed at preventing access to children. He cannot date people who have children or "initiate or prolong contact with minor children without the presence of an adult who is knowledgeable of the offense and has been approved by the supervising

---

[10] Internal quotation marks omitted.

[CCO]." He must "[s]tay out of areas where children's activities regularly occur or are occurring" and cannot "remain overnight in a residence where minor children live or are spending the night."

Read in context, Wilson's community custody condition is specific enough to prevent arbitrary enforcement, and an ordinary person would understand that the condition aims to prevent easy access to children—a possibility in any relationship. The condition is not unconstitutionally vague.

5. <u>SAG</u>

Finally, in a SAG, Wilson argues that he received ineffective assistance of appellate counsel because his attorney failed to raise certain issues on appeal. Specifically, Wilson argues his appellate lawyer should have argued that RCW 9A.44.020(1) is unconstitutional because it "allow[s] the [S]tate to exceed its competent jurisdiction."

The exercise of independent judgment in deciding which issues may be the basis of a successful appeal is at the heart of the attorney's role in our legal process. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 313-14, 868 P.2d 835 (1994). To prevail on a claim of ineffective assistance of appellate counsel for failing to raise an issue, a defendant must show the merit of the legal issue that counsel failed to raise and demonstrate actual prejudice. *Id.* at 314.

Under RCW 9A.44.020(1), to convict a person of any sex crime, "it shall not be necessary that the testimony of the alleged victim be corroborated."[11] Wilson argues that this statute violates equal protection and due process rights

---

[11] The trial court did not provide such an instruction to the jury.

because it compels defendants "to plead guilty or face life in prison at trial" and renders all pretrial challenges "moot" or "frivolous."[12]  He also argues that the statute prevents judges on direct review from making "determinations on the inefficiency of the [S]tate's evidence," rendering direct appeals unconstitutionally unfair.  But Wilson does not support his broad claims with legal authority or analysis.  So, we cannot determine whether his arguments have merit or that he was actually prejudiced.  *Lord*, 123 Wn.2d at 314.  We reject Wilson's claim of ineffective assistance of appellate counsel.

In sum, the trial court did not violate Wilson's right to a fair and impartial jury by allowing biased jurors to serve on his jury, it did not conduct an inadequate investigation into the jurors' possible bias or erroneously deny him a mistrial, his community custody condition that he not form relationships with families who have minor children as directed by his CCO is not unconstitutionally vague, and he does not support his SAG arguments with legal authority or analysis.  We affirm.

Bowman, J

WE CONCUR:

Díaz, J.

Birk, J.

---

[12] Capitalization omitted.

16